**Chenoweth Law Group, PC**
Robert J. McGaughey, OSB No. 800787
bobm@chenowethlaw.com
Aurelia Erickson, OSB No. 126170
aerickson@chenowethlaw.com
510 SW Fifth Ave., Fourth Floor
Portland, Oregon 97204
Telephone: (503) 221-7958
Fax: (503) 221-2182

*Liaison Counsel for Plaintiff*

[Additional counsel on signature page]

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| FRANCES O'HALLORAN, derivatively on behalf of EXPENSIFY, INC., | Case No.: |
| Plaintiff, | |
| vs. | **COMPLAINT** |
| DAVID BARRETT, RYAN SCHAFFER, ANURADHA MURALIDHARAN, JASON MILLS, DANIEL VIDAL, TIMOTHY CHRISTEN, ELLEN PAO, YING (VIVIAN) LIU, BLAKE BARTLETT, and ROBERT LENT, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and | |
| EXPENSIFY, INC., | |
| Nominal Defendant | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff Frances O'Halloran ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Expensify, Inc. ("Expensify" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants David Barrett ("Barrett"), Ryan Schaffer ("Schaffer"), Anuradha Muralidharan ("Muralidharan"), Jason Mills ("Mills"), Daniel Vidal ("Vidal"), Timothy Christen ("Christen"), Ellen Pao ("Pao"), Ying (Vivian) Liu ("Liu"), Blake Bartlett ("Bartlett"), and Robert Lent ("Lent") (collectively, the "Individual Defendants" and together with Expensify, the "Defendants") for breaches of their fiduciary duties as controlling shareholders, directors and officers of Expensify, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and for contribution under Section 11(f) of the Securities Act of 1933 (the "Securities Act") and Section 21D of the Exchange Act against Defendants Barrett, Schaffer, Bartlett, and Lent. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Expensify, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Expensify's controlling shareholders, officers, and directors from November 11, 2021 through November 8, 2023, both dates inclusive (the "Relevant Period").

2.      Expensify purports to operate as an expense management software platform that "helps the smallest to the largest businesses simplify the way they manage money." To this end, Expensify created a cloud-based platform which allows businesses to manage payments, design invoices, and pay bills, among other things.

3.      The Company was originally created to improve the experience of everyday employees' expense management. Today, Expensify's users can use the software to accomplish a variety of tasks, such as to "scan and reimburse receipts from flights, hotels, coffee shops, office supplies and ride shares."

4.      Expensify filed a registration statement on Form S-1 with the SEC in connection with its initial public offering ("IPO") on October 15, 2021. The registration statement was then declared effective by the SEC on November 9, 2021 (the "Registration Statement"). The Registration Statement was signed by Defendants Barrett, Schaffer, Bartlett, and Lent.

5.      Pursuant to the signed Registration Statement, on or around November 11, 2021, Expensify conducted the IPO. The Company's common stock began publicly trading on the Nasdaq Global Select Market ("NASDAQ"). Expensify's common stock trades under the ticker symbol "EXFY."

6.      The Company filed a prospectus on Form 424B4 with the SEC in connection with the IPO on November 12, 2021. The prospectus incorporated and formed part of the Registration Statement (the "Prospectus" and, collectively with the Registration Statement, the "Offering Documents").

7.    Pursuant to the Offering Documents, the Company, along with other selling stockholders identified in the Prospectus, sold approximately 2.6 million and 7.1 million shares of Expensify common stock to the public, respectively, at an offering price of $27.00 per share. According to the Offering Documents, the total proceeds amounted to approximately $65 million and $178 million to Expensify and the selling stockholders, respectively, after applicable underwriting discounts and commissions.

8.    The truth began to emerge on June 12, 2023, when Morgan Stanley downgraded the Company from Equal-weight to Underweight. In particular, Morgan Stanley cited Expensify's risk-reward profile and structural challenges for the primary reasons behind the downgrade.

9.    On this news, the Company's stock price fell $0.45 per share, or 6.28%, to close at $6.72 per share on June 12, 2023.

10.    Almost two months later, on August 8, 2023, the truth continued to emerge when the Company issued a press release to announce its second quarter of 2023 financial and operating results ("Q2 2023 Results"). Here, the Company reported, in part, that: (1) GAAP EPS of-$0.14, missing the consensus estimate of -$0.07, which equated to revenue of $38.9 million, compared to the missed consensus estimate of $41.5 million; (2) net loss was $11.3 million, a $3.3 million increase compared to the same period last year; and (3) non-GAAP net loss was $1.0 million.

11.    That same day, on August 8, 2023, the Individual Defendants discussed the Q2 2023 Results in an earnings conference call with investors and analysts. During the call, Defendant Muralidharan stated, "I'll say this, for a few quarters now, since the day we went public really, we have not been in sort of normal or stable economic conditions."

12.     As a result of these disclosures, JMP Securities downgraded Expensify from Market Outperform to Market Perform. On this news, the Company's stock price fell further. The common stock price fell $1.69 per share, or 28.55%, to close at $4.23 per share on August 9, 2023.

13.     The truth fully emerged on November 7, 2023, when the Company issued a press release announcing Expensify's Q3 2023 financial and operating results ("Q3 2023 Results). Here, the press release revealed, in part, that: (1) GAAP loss for Q3 was $0.21 per share, which equated to revenue of $36.5 million, a 14% decrease compared to the same period last year; (2) net loss was $17 million, an $8.8 million increase compared to the same period last year; and (3) non-GAAP net loss was $6.7 million.

14.     On this news, Expensify's common stock price continued to fall. The common stock price fell $1.07 per share, or 36.89%, to close at $1.83 per share on November 8, 2023.

15.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements in the Offering Documents. The Offering Documents failed to disclose, *inter alia*, that: (i) the Company's revenue growth was exponentially susceptible to macroeconomic and structural challenges; (ii) consequently, the Company exaggerated the efficiency of Expensify's business model and the likelihood of success in meeting the long-term growth projections referenced in the Offering Documents; (iii) due to the foregoing, the Individual Defendants overstated Expensify's post-IPO growth, business, and financial prospects; and (iv) the Company did not maintain adequate internal controls. As a result, Expensify's public statements were materially false and misleading at all relevant times.

16.     In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Expensify to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between May 1, 2023, and May 31, 2023, approximately 504,493 shares of Expensify's common stock were repurchased, costing the Company over $2.9 million.

17.     In further breach of his fiduciary duties, Defendant Barrett also failed to maintain internal controls while engaging in lucrative insider trading, reaping personal profits exceeding $5,780,964.

18.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

19.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), and two of its former directors to a federal securities fraud class action lawsuit pending in the United States District Court for the District of Oregon (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

20.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

21.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and

misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of various of the directors' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a) and 78t-1, SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)), and Section 11(f) of the Securities Act (15 U.S.C. § 77k(f)(1)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Securities Act.

23.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

24.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

25.     Venue is proper in this District because Expensify is headquartered in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

COMPLAINT                                7

## PARTIES

### Plaintiff

26.    Plaintiff is a current shareholder of Expensify. Plaintiff has continuously held Expensify common stock since October 26, 2021.

### Nominal Defendant Expensify

27.    Nominal Defendant Expensify is a Delaware corporation that is headquartered at 401 SW 5th Avenue, Portland, Oregon 97204. Expensify stock trades on the NASDAQ under the ticker symbol "EXFY."

### Defendant Barrett

28.    Defendant Barrett is the founder of Expensify. Defendant Barrett has served as the Company's CEO and as a Company director since August 2009. He also serves as the Chair of the Compensation Committee.

29.    According to the Company's Schedule 14A filed with the SEC on April 28, 2023 (the "2023 Proxy Statement"), as of April 24, 2023, Defendant Barrett beneficially owned 13,660,023 shares of the Company's Class A common stock. His Company stock ownership includes 6,388,574 shares of the Company's Class A common stock, 3,600,066 shares of the Company's LT10 stock, and 3,671,383 shares of the Company's LT50 stock, representing 45.8% of the total voting power of the Company—making Defendant Barrett a controlling shareholder of the Company. Given that the price per share of the Company's common stock at the close of trading on April 24, 2023, was $8.04, Defendant Barrett owned approximately $51,364,135 worth of Expensify Class A common stock as of that date.

30.    For the fiscal year ending on December 31, 2021 ("Fiscal Year 2021"), Defendant Barrett received $19,967,553 in total compensation from the Company. This included $1,056,728 in salary and $18,910,825 in stock awards. For the fiscal year ending on December 31, 2022

("Fiscal Year 2022"), Defendant Barrett received $1,654,892 in total compensation from the Company. This included $1,606,327 in salary and $48,565 in stock awards.

31.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Barrett made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| October 12, 2022 | 30,000 | $13.86 | $415,800 |
| November 10, 2022 | 30,000 | $12.33 | $369,900 |
| December 14, 2022 | 30,000 | $9.56 | $286,800 |
| January 11, 2023 | 30,000 | $9.08 | $272,400 |
| February 8, 2023 | 30,000 | $9.80 | $294,000 |
| March 9, 2023 | 30,000 | $8.28 | $248,399 |
| April 12, 2023 | 30,000 | $8.17 | $245,100 |
| May 10, 2023 | 30,000 | $5.99 | $179,700 |
| June 1, 2023 | 200,000 | $6.55 | $1,310,000 |
| June 14, 2023 | 30,000 | $6.99 | $209,700 |
| July 12, 2023 | 30,000 | $7.52 | $225,600 |
| August 9, 2023 | 30,000 | $4.26 | $127,800 |
| September 8, 2023 | 263,333 | $3.96 | $1,042,798 |
| September 11, 2023 | 66,667 | $3.88 | $258,667 |
| September 12, 2023 | 20,000 | $4.09 | $81,800 |
| September 13, 2023 | 30,000 | $3.86 | $115,800 |
| October 11, 2023 | 30,000 | $3.19 | $96,700 |

Thus, in total, before the fraud was exposed, Defendant Barrett sold 940,000 shares of Company Stock on inside information, for which he received approximately $5,780,964 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

32.    Expensify's 2023 Proxy Statement stated the following about Defendant Barrett:

David Barrett founded Expensify and has served as our Chief Executive Officer and as a member of our board of directors since 2009. Prior to Expensify, Mr. Barrett led engineering for Red Swoosh, Inc., a peer-to-peer file sharing company, which was acquired by Akamai Technologies, Inc. in 2007. Mr. Barrett holds a B.S.E. in engineering from the University of Michigan. We believe that Mr. Barrett is qualified to serve as a member of our board of directors due to his strategic vision and leadership in conceptualizing and developing our brand and business, his expertise in technology and the perspective and experience he brings as our founder and Chief Executive Officer.

**Defendant Schaffer**

33.    Defendant Schaffer has served as the Company's CFO and as a Company director since 2017. He also serves as a member of the Compensation Committee. According to the Company's 2023 Proxy Statement as of April 24, 2023, Defendant Schaffer beneficially owned 1,020,213 shares of the Company's common stock. His Company stock ownership includes 496,588 shares of the Company's Class A common stock, 498,090 shares of the Company's LT10 stock, and 25,535 shares of the Company's LT50 stock, representing 1.4% of the total voting power of the Company. Given that the price per share of the Company's common stock at the close of trading on April 24, 2023, was $8.04, Defendant Schaffer owned approximately $3,992,567.52 worth of Expensify Class A common stock as of that date.

34.    For Fiscal Year 2021, Defendant Schaffer received $9,552,730 in total compensation from the Company. This included $725,294 in salary, $5,128,747 in stock awards, $566,516 in bonuses, and $2,957,367 in all other compensation. For Fiscal Year 2022, Defendant Schaffer received $874,840 in total compensation from the Company. This included $864,750 in salary, $1,755 in stock awards, and $8,335 in all other compensation.

35.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Schaffer made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| November 15, 2021 | 119,996 | $25.11 | $3,013,099 |
| July 8, 2022 | 4,699 | $20.11 | $94,496 |
| July 29, 2022 | 4,699 | $20.01 | $94,026 |
| August 24, 2022 | 4,699 | $20.00 | $93,980 |
| June 21, 2023 | 7,750 | $8.04 | $62,309 |
| July 3, 2023 | 400 | $8.00 | $3,200 |
| July 13, 2023 | 7,350 | $8.00 | $58,800 |
| May 10, 2023 | 30,000 | $5.99 | $179,700 |
| June 1, 2023 | 200,000 | $6.55 | $1,310,000 |
| June 14, 2023 | 30,000 | $6.99 | $209,700 |
| July 12, 2023 | 30,000 | $7.52 | $225,600 |
| August 1, 2023 | 100 | $8.00 | $800 |
| August 31, 2023 | 3,900 | $4.39 | $17,121 |
| September 11, 2023 | 66,667 | $3.88 | $258,667 |
| September 29, 2023 | 4,000 | $3.28 | $13,120 |
| October 31, 2023 | 4,000 | $2.67 | $10,680 |

Thus, in total, before the fraud was exposed, Defendant Schaffer sold 518,260 shares of Company common stock on inside information, for which he received approximately $5,645,298 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

36.     Expensify's 2023 Proxy Statement stated the following about Defendant Schaffer:

Ryan Schaffer has served as our Chief Financial Officer and a member of our board of directors since 2017, and he previously served as our Director of Marketing and Strategy from 2013-2017. Mr. Schaffer worked in marketing at various companies prior to joining Expensify. Mr. Schaffer holds a B.S. in business from the University of Dayton. We believe that Mr. Schaffer is qualified to serve as a

member of our board of directors due to his perspective and experience as our Chief Financial Officer, his experience leading our board meetings since 2019 and his significant knowledge of and history with our company.

**Defendant Muralidharan**

37.    Defendant Muralidharan has served as the Company's Chief Operating Officer ("COO") since January 2021 and has served as a Company director since November 2021. She also serves as a member of the Compensation Committee. According to the Company's 2023 Proxy Statement, as of April 24, 2023, Defendant Muralidharan beneficially owned 322,458 shares of the Company's common stock. Her Company stock ownership includes 99,457 shares of the Company's Class A common stock, 114,140 shares of the Company's LT10 stock, and 108,861 shares of the Company's LT50 stock, representing 1.4% of the total voting power of the Company. Given that the price per share of the Company's common stock at the close of trading on April 24, 2023, was $8.04, Defendant Muralidharan owned approximately $2,592,568.32 worth of Expensify Class A common stock as of that date.

38.    For Fiscal Year 2021, Defendant Muralidharan received $5,867,462 in total compensation from the Company. This included $163,732 in salary, $4,142,795 in stock awards, $634,414 in bonuses, and $575,109 in all other compensation. For Fiscal Year 2022, Defendant Muralidharan received $470,657 in total compensation from the Company. This included $447,040 in salary, $10,066 in stock awards, and $13,551 in all other compensation.

39.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Muralidharan made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| January 26, 2023 | 20,000 | $10.00 | $200,000 |
| June 13, 2023 | 14,390 | $7.00 | $100,730 |

| September 15, 2022 | 13,000 | $3.63 | $47,190 |

Thus, in total, before the fraud was exposed, Defendant Muralidharan sold 47,390 shares of Company stock on inside information, for which she received approximately $347,920 in proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates her motive in facilitating and participating in the scheme.

40.    Expensify's 2023 Proxy Statement stated the following about Defendant Muralidharan:

> Anu Muralidharan has served as our Chief Operating Officer since January 2021 and a member of our board of directors since our IPO. Ms. Muralidharan previously served as our Director of Product Operations from January 2018 to January 2021 and as our Head of Payment Operations from August 2015 to January 2018. Prior to joining Expensify, she held Vice President positions at Citibank and Marqeta Inc., and various engineering roles at Oracle. Ms. Muralidharan holds a B.E. in electrical and electronics engineering from Birla Institute of Technology and Science, Pilani in Pilani, India and an M.B.A from Cornell University. We believe that Ms. Muralidharan is qualified to serve as a member of our board of directors due to her long history and experience in the payments industry, comprehensive knowledge of payments systems, and perspective and experience as our Chief Operating Officer.

**Defendant Mills**

41.    Defendant Mills has served as the Company's Chief Product Officer ("CPO") and as a Company director since May 2021. He also serves as a member of the Compensation Committee. Defendant Mills previously served as Director of Products and Customers from 2013-2021. According to the Company's 2023 Proxy Statement, as of April 24, 2023, Defendant Mills beneficially owned 1,229,269 shares of the Company's common stock. His Company stock ownership includes 103,816 of the Company's Class A common stock, 582,885 shares of LT10 stock, and 542,568 shares of LT50 stock, representing 6.7% of the total voting power of the Company. Given that the price per share of the Company's common stock at the close of trading

on April 24, 2023, was $8.04, Defendant Mills owned approximately $834,680.64 worth of Expensify's Class A common stock as of that date.

42.     Expensify's 2023 Proxy Statement stated the following about Defendant Mills:

Jason Mills has served as a member of our board of directors since our IPO. Mr. Mills has served as our Chief Product Officer since May 2021, and he previously served as our Director of Product and Customers from January 2013 to May 2021. Prior to Expensify, Mr. Mills served as an analyst intern at Zurich Financial from February 2010 to August 2010 and as an analyst intern at Goldman Sachs from June 2009 to August 2009. Mr. Mills holds a B.S. in Business Administration from the University of California, Berkeley, Haas School of Business and a Master of Arts in International Economics from Johns Hopkins University, School of Advanced International Studies. We believe that Mr. Mills is qualified to serve as a member of our board of directors due to his long history of leadership with our company, his perspective and experience as our Chief Product Officer and his comprehensive knowledge of our business.

**Defendant Vidal**

43.     Defendant Vidal has served as the Company's Chief Strategy Officer ("CSO") since May 2021 and as a Company director since November 2021. He also serves as a member of the Compensation Committee. According to the Company's 2023 Proxy Statement as of April 24, 2023, Defendant Vidal beneficially owned 536,485 shares of the Company's common stock. His Company stock ownership includes 294,243 shares of the Company's Class A common stock, 112,650 shares of the Company's LT10 stock, and 129,592 shares of the Company's LT50 stock, representing 1.6% of the total voting power of the Company. Given that the price per share of the Company's common stock at the close of trading on April 24, 2023, was $8.04, Defendant Vidal owned approximately $2,365,713.72 worth of Expensify Class A common stock as of that date.

44.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Vidal made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| February 15, 2023 | 5,000 | $9.82 | $49,100 |

| June 20, 2023 | 8,000 | $7.59 | $60,720 |
| September 1, 2022 | 5,000 | $4.39 | $21,950 |

Thus, in total, before the fraud was exposed, Defendant Vidal sold 18,000 shares of Company

Stock on inside information, for which he received approximately $131,770 in proceeds. His

insider sales, made with knowledge of material nonpublic information before the material

misstatements and omissions were exposed, demonstrates his motive in facilitating and

participating in the scheme.

45.     Expensify's 2023 Proxy Statement stated the following about Defendant Vidal:

Daniel Vidal has served as a member of our board of directors since our IPO. Mr.
Vidal has served as our Chief Strategy Officer since May 2021, and he previously
served as our Director of Corporate Development & Strategy from February 2019
to May 2021 and Head of Business Development from August 2013 to February
2019. Mr. Vidal holds a B.S. in Kinesiology from Arizona State University and a
Masters in Commerce from the University of Virginia. We believe that Mr. Vidal
is qualified to serve as a member of our board of directors due to his long history
of employment with our company, his perspective and experience as our Chief
Strategy Officer and his leadership developing our Strategic Partnership program
and ExpensifyApproved! Accountants program.

**Defendant Christen**

46.     Defendant Christen has served as a Company director since November 2021.

Defendant Christen also serves as the Chair of the Audit Committee.  According to the Company's

2023 Proxy Statement as of April 24, 2023, Defendant Christen beneficially owned 21,173 shares

of the Company's common stock. His Company stock ownership includes 21,173 shares of the

Company's Class A common stock, representing less than 1% of the total voting power of the

Company. Given that the price per share of the Company's common stock at the close of trading

on April 24, 2023, was $8.04, Defendant Christen owned approximately $170,230.92 worth of

Expensify Class A common stock as of that date.

47.     Expensify's 2023 Proxy Statement stated the following about Defendant Christen:

Timothy L. Christen has served on our board of directors since the effectiveness of
our IPO registration statement. Mr. Christen has served as a director of Mayville

Engineering Company, a publicly traded value added manufacturer, since June 2016 and serves as the Chairman of the Audit Committee. Mr. Christen served as Chairman and Chief Executive Officer of Baker Tilly US, LLP, a national public accounting firm, from June 1999 to May 2016. Mr. Christen also served as the non-executive Chairman of Baker Tilly International Ltd. from October 2017 to October 2021 and as a director of CPA.com, a CPA firm solutions and strategies provider, since February 2018. Mr. Christen also served as director of the American Institute of CPAs from 2014 to 2017, serving as Chairman from 2015 to 2016, and since January 2021 serves as a trustee of the Financial Accounting Foundation. Mr. Christen holds a B.S. in accounting from the University of Wisconsin-Platteville and is a licensed certified public accountant. We believe that Mr. Christen is qualified to serve as a member of our board of directors due to his over 38 years of accounting expertise and substantial strategy, risk and management experience over his 16 years as the Chief Executive Officer of a national public accounting firm and membership on the boards of various publicly traded companies.

**Defendant Pao**

48.    Defendant Pao has served as a Company director since November 2021. Defendant Pao also serves as a member of the Audit Committee. According to the Company's 2023 Proxy Statement as of April 24, 2023, Defendant Pao beneficially owned 19,291 shares of the Company's Class A common stock. Her Company stock ownership includes 19,291 shares of the Company's Class A common stock, representing less than 1% of the total voting power of the Company. Given that the price per share of the Company's common stock at the close of trading on April 24, 2023, was $8.04, Defendant Pao owned approximately $155,099.64 worth of Expensify Class A common stock as of that date.

49.    Expensify's 2023 Proxy Statement stated the following about Defendant Pao:

Ellen Pao has served on our board of directors since our IPO. Ms. Pao cofounded and has lead Project Include, a nonprofit advocating for diversity, equity and inclusion in technology companies, since December 2015. Ms. Pao has served as Chief Executive Officer and as a board member of Project Include since January 2017. Prior to Project Include, Ms. Pao served as Interim Chief Executive Officer and Executive Vice President of Business Development of Reddit, a social media platform, from April 2012 until July 2015. Prior to Reddit, Ms. Pao served as Chief Diversity and Inclusion Officer at Kapor Center and Venture Partner at Kapor Capital from January 2017 until March 2018. Ms. Pao holds a B.S.E in electrical engineering from Princeton University, a J.D. from Harvard Law School and an M.B.A from Harvard Business School. We believe that Ms. Pao is qualified to serve as a member of our board of directors due to her focus on diversity and inclusion and her experience as a board observer, board member, investor and advisor to technology startups since 2005.

**Defendant Liu**

50.     Defendant Liu has served as a Company director since November 2021. Defendant Liu also serves as a member of the Audit Committee. According to the Company's 2023 Proxy Statement as of April 24, 2023, Defendant Liu beneficially owned 20,119 shares of the Company's common stock. Her Company stock ownership includes 20,119 shares of the Company's Class A common stock, representing less than 1% of the total voting power of the Company. Given that the price per share of the Company's common stock at the close of trading on April 24, 2023 was $8.04, Defendant Liu owned approximately $161,756.76 worth of Expensify Class A common stock as of that date.

51.     Expensify's 2023 Proxy Statement stated the following about Defendant Liu:

> Ying (Vivian) Liu has served on our board of directors since our IPO. Ms. Liu has served as Chief Operating Officer and Chief Financial Officer of ContextLogic, Inc. (d/b/a Wish), a mobile ecommerce platform since November 2021. Prior to Wish, Ms. Liu served as Chief Financial Officer of Shutterfly, Inc., a retailer and manufacturing platform for personalized products, from April 2020 to November 2021. Prior to Shutterfly, Inc., Ms. Liu served as the Chief Financial Officer and Senior Vice President of Lexmark Inc., a printing solutions company, from July 2017 to April 2020. Prior to Lexmark Inc., Ms. Lui served as VP, Finance of Huawei Technology, an enterprise networking solutions company, from October 2016 until July 2017. Prior to Huawei, Ms. Liu spent eight years at Cisco in multiple finance leadership positions. Earlier in her career, Ms. Liu worked at Deloitte & Touche, Goldman Sachs and China Merchants Bank. Ms. Liu holds a B.A. in international finance from Shanghai University of Finance and Economics, an M.B.A from the University of Washington and is a licensed chartered financial analyst and certified public accountant. We believe that Ms. Liu is qualified to serve as a member of our board of directors due to her extensive finance and leadership experience.

**Defendant Bartlett**

52.     Defendant Bartlett served as a Company director from January 2015 to November 2021. Defendant Bartlett resigned as a Company director immediately prior to the completion of the Company's IPO.

53.     Expensify's Prospectus stated the following about Defendant Bartlett:

> Blake Bartlett has served as a member of our board of directors since January 2015.

Mr. Bartlett has served as Partner of Openview Venture Partners, a venture capital firm, since November 2013. Prior to OpenView, Mr. Bartlett served as Vice President and an Associate at Battery Ventures, a venture capital firm, from July 2009 to October 2013 and an Associate at Kayne Anderson Capital Advisors, LP, a private equity investments firm, from June 2007 to June 2009. Mr. Bartlett holds a B.S. in business administration from the University of Southern California. We believe that Mr. Bartlett is qualified to serve as a member of our board of directors due to his extensive experience as a board member of various high-growth technology companies and his knowledge of our industry. Mr. Bartlett will resign from our board of directors contingent upon, and effective immediately prior to, the completion of this offering.

**Defendant Lent**

54.     Defendant Lent served as a Company director from January 2015 to November 2021. Defendant Lent resigned as a Company director immediately prior to the completion of the Company's IPO.

55.     Expensify's Prospectus stated the following about Defendant Lent:

Robert Lent has served as a member of our board of directors since February 2018, and was previously on our board of directors from 2012 to 2015. Mr. Lent has served as Managing Partner at Hillsven Capital, a seed venture firm focused on internet, cloud, e-commerce and mobile, since 2006. Prior to Hillsven Capital, Mr. Lent co-founded and served as Vice President of Corporate Development for Ariba, Inc., a procurement and supply chain solution for businesses, which was bought by SAP AG. Mr. Lent holds a B.S. in business from the University of California, Berkeley and an M.B.A. from Harvard Business School. We believe that Mr. Lent is qualified to serve as a member of our board of directors due to his extensive experience as a board member of various high-growth software companies, his success as a founder and his knowledge of our industry. Mr. Lent will resign from our board of directors contingent upon, and effective immediately prior to, the completion of this offering.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

56.     By reason of their positions as controlling shareholders, officers, directors, and/or fiduciaries of Expensify and because of their ability to control the business and corporate affairs of Expensify, the Individual Defendants owed Expensify and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Expensify in a fair, just, honest, and equitable manner. The Individual

Defendants were and are required to act in furtherance of the best interests of Expensify and its shareholders so as to benefit all shareholders equally.

57.     Each director and officer of the Company owes to Expensify and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

58.     The Individual Defendants, because of their positions of control and authority as controlling shareholders, officers, and directors of Expensify, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

59.     To discharge their duties, the officers and directors of Expensify were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

60.     Each Individual Defendant, by virtue of their position as a controlling shareholder, officer, and director, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholders, officers, and directors of Expensify, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

61.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of

inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

62.    To discharge their duties, the controlling shareholders, officers, and directors of Expensify were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Expensify were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Oregon, and the United States, and pursuant to Expensify's own Code of Ethics and Conduct (the "Code of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Expensify conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Expensify and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Expensify's operations would comply with all applicable laws and Expensify's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

63.     Each of the Individual Defendants further owed to Expensify and the shareholders the duty of loyalty, requiring that each favor Expensify's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

64.     At all times relevant hereto, the Individual Defendants were the agents of each other and Expensify and were at all times acting within the course and scope of such agency.

65.     Because of their advisory, executive, managerial, and directorial positions with Expensify, each of the Individual Defendants had access to adverse, non-public information about the Company.

66.     The Individual Defendants, because of their positions of control and authority, were able to, and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Expensify.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

67.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

68.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

69.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Expensify was a

direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

70.     Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

71.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Expensify and was at all times acting within the course and scope of such agency.

### EXPENSIFY'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

#### *Expensify's Code of Conduct*

72.     The Company's Code of Conduct represents that it applies to "All directors, officers and employees of the Company and all of [Expensify's] subsidiaries and controlled affiliates are expected to be familiar with the Code and to adhere to those principles and procedures set forth below. Covered Parties must conduct themselves accordingly, exhibiting the highest standard of business and professional integrity, and seek to avoid even the appearance of improper behavior."

73.     The Code of Conduct starts by providing that:

In accordance with the requirements of the Securities and Exchange Commission (the "SEC"), and the National Association of Securities Dealers Automated Quotations Stock Market ("Nasdaq") Listing Standards, the Board of Directors (the "Board") of Expensify, Inc. (the "Company") has adopted this Code of Ethics and Conduct (the "Code") to encourage:

- Honest and ethical conduct, including fair dealing and the ethical handling of actual or apparent conflicts of interest;

- Full, fair, accurate, timely and understandable disclosure;

- Compliance with applicable governmental laws, rules and regulations;

- Prompt internal reporting of any violations of law or the Code;

- Accountability for adherence to the Code, including fair process by which to determine violations;

- Consistent enforcement of the Code, including clear and objective standards for compliance;

- Protection for persons reporting any such questionable behavior;

- The protection of the Company's legitimate business interests, including its assets and corporate opportunities; and

- Confidentiality of information entrusted to directors, officers and employees by the Company and its customers.

74.    The Code of Conduct provides, as to "Conflicts of Interest," that:

A conflict of interest occurs when the private interests of a Covered Party interfere, or appear to interfere, with the interests of the Company as a whole.

For example, a conflict of interest can arise when a Covered Party takes actions or has personal interests that may make it difficult to perform his or her Company duties objectively and effectively. A conflict of interest may also arise when a Covered Party, or a member of his or her immediate family, receives improper personal benefits as a result of his or her position at 1 the Company.

Each Covered Party has an obligation to conduct the Company's business in an honest and ethical manner, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships. Any situation that involves, or may reasonably be expected to involve, a conflict of interest with the Company, should be disclosed promptly to the Company's Audit Committee of the Board. This Code does not attempt to describe all possible conflicts of interest that could develop. Other common conflicts from which Covered Parties must refrain are set out below:

- Covered Parties may not engage in any conduct or activities that are inconsistent with the Company's best interests or that disrupt or impair the Company's relationship with any person or entity with which the Company has or proposes to enter into a business or contractual relationship.

- Covered Parties may not accept compensation, in any form, for services performed for the Company from any source other than the Company.

- No Covered Party may take up any management or other employment position with, or have any material interest in, any firm or company that is in direct or indirect competition with the Company.

75.     The Code of Conduct provides, as to "Compliance with Laws, Rules and Regulations," that:

The Company is obligated to comply with all applicable laws, rules and regulations. It is the personal responsibility of each Covered Party to adhere to the standards and restrictions imposed by these laws, rules and regulations in the performance of his or her duties for the Company.

The principal executive officer, principal financial officer, principal accounting officer or controller (or persons performing similar functions) of the Company (together, the "Senior Financial Officers") are also required to promote compliance by all employees with the Code and to abide by Company standards, policies and procedures.

Covered Parties located outside of the United States must comply with laws, regulations, rules and regulatory orders of the United States, including the Foreign Corrupt Practices Act ("FCPA") and U.S. export control laws, in addition to applicable local laws.

76.     The Code of Conduct provides, as to "Insider Trading," that:

Trading on inside information is a violation of federal securities law. Covered Parties in possession of material nonpublic information about the Company or companies with whom we do business must abstain from trading or advising others to trade in the respective company's securities from the time that they obtain such inside information until adequate public disclosure of the information. Material information is information of such importance that it can be expected to affect the judgment of investors as to whether or not to buy, sell, or hold the securities in question. To use nonpublic information for personal financial benefit or to "tip" others, including family members, who might make an investment decision based on this information is not only unethical but also illegal. Covered Parties who trade stock based on insider information can be personally liable for damages totaling up to three times the profit made or loss avoided by the respective Covered Party.

77.     The Code of Conduct provides, as to "Reporting, Accountability and Enforcement," that:

The Company promotes ethical behavior at all times and encourages Covered Parties to talk to supervisors, managers and other appropriate personnel, including the officers, outside counsel for the Company and the Board or the relevant committee thereof, when in doubt about the best course of action in a particular situation.

Covered Parties should promptly report suspected violations of laws, rules, regulations or the Code or any other unethical behavior by any director, officer, employee or anyone purporting to be acting on the Company's behalf to appropriate personnel, including officers, outside counsel for the Company and the Board or the relevant committee thereof. Reports may be made anonymously. If requested, confidentiality will be maintained, subject to applicable law, regulations and legal proceedings.

The Audit Committee of the Board shall investigate and determine, or shall designate appropriate persons to investigate and determine, the legitimacy of such reports. The Audit Committee will then determine the appropriate disciplinary action. Such disciplinary action includes, but is not limited to, reprimand, termination with cause, and possible civil and criminal prosecution.

To encourage employees to report any and all violations, the Company will not tolerate retaliation for reports made in good faith. Retaliation or retribution against any Covered Party for a report made in good faith of any suspected violation of laws, rules, regulations or this Code is cause for appropriate disciplinary action.

78.    The Code of Conduct provides, as to "Corporate Opportunities," that:

All Covered Parties owe a duty to the Company to advance the legitimate interests of the Company when the opportunity to do so arises. Covered Parties are prohibited from directly or indirectly (a) taking personally for themselves opportunities that are discovered through the use of Company property, information or positions; (b) using Company property, information or positions for personal gain; or (c) competing with the Company for business opportunities; provided, however, if the disinterested directors of the Board determine that the Company will not pursue an opportunity that relates to the Company's business, a Covered Party may do so, after notifying the disinterested directors of the Board of intended actions in order to avoid any appearance of conflict of interest.

79.    The Code of Conduct provides, as to "Confidentiality," that:

In carrying out the Company's business, Covered Parties may learn confidential or proprietary information about the Company, its customers, distributors, suppliers, joint venture or other business partners. Confidential or proprietary information includes all nonpublic information relating to the Company, or other companies, that would be harmful to the relevant company or useful or helpful to competitors if disclosed, including financial results or prospects, information provided by a third

party, trade secrets, new product or marketing plans, research and development ideas, potential acquisitions or investments, or information of use to our competitors or harmful to us or our customers if disclosed.

Covered Parties must maintain the confidentiality of all information so entrusted to them, except when disclosure is authorized or legally mandated. Covered Parties must safeguard confidential information by keeping it secure, limiting access to those who have a need to know in order to do their job, and avoiding discussion of confidential information in public areas such as planes, elevators, and restaurants and on mobile phones. This prohibition includes, but is not limited to, inquiries made by the press, analysts, investors or others. Covered parties also may not use such information for personal gain. These confidentiality obligations continue even after employment or service with the Company ends and in no way diminish any additional confidentiality obligations that may apply to Covered Parties by way of their employment agreements, separate confidentiality agreements with the Company, or otherwise at law.

80.    The Code of Conduct provides, as to the "Fair Dealing," that:

Each Covered Party should endeavor to deal fairly with the Company's customers, service providers, suppliers, competitors and employees. No Covered Party should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any unfair dealing practice. Inappropriate use of proprietary information, misusing trade secret information that was obtained without the owner's consent, or inducing such disclosures by past or present employees of other companies is also prohibited.

81.    The Code of Conduct provides, as to "Protection and Proper Use of Company Assets," that:

All Covered Parties should protect the Company's assets and ensure their efficient use. Theft, carelessness and waste have a direct impact on the Company's profitability. All Company assets should be used only for legitimate business purposes. The obligation of Covered Parties to protect the Company's assets includes its proprietary information. Proprietary information includes intellectual property such as trade secrets, patents, trademarks and copyrights, as well as business, marketing and service plans, engineering and manufacturing ideas, designs, databases, records, salary information and any unpublished financial data and reports.

82.    The Code of Conduct provides, as to "No Rights Created," that:

This Code is a statement of certain fundamental principles, policies and procedures that govern the Company's Covered Parties in the conduct of the Company's business. It is not intended to and does not create any rights in any employee,

customer, client, visitor, supplier, competitor, shareholder or any other person or entity. It is the Company's belief that the policy is robust and covers most conceivable situations.

83.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, and unjust enrichment. Moreover, four of the Individual Defendants violated the Insider Trading section of the Code of Conduct by engaging in insider trading. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## EXPENSIFY'S AUDIT COMMITTEE CHARTER

84.     The Company's Audit Committee Charter (the "Audit Committee Charter") states that the purpose of the Audit Committee "is to oversee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company."

85.     The Audit Committee Charter outlines the primary responsibilities of the Audit Committee:

II.    **Composition**.
The Committee must consist of at least three directors, subject to any available exception. Each Committee member must satisfy the independence requirements of the Nasdaq Stock Market LLC ("Nasdaq") and the more rigorous independence rules for members of the Audit Committee issued by the Securities and Exchange Commission (the "SEC"), subject to any available exception. Each Committee member must be able to read and understand fundamental financial statements, including a company's balance sheet, income statement and cash flow statement. In addition, at least one member of the Committee must be a financial expert as defined under SEC rules.

III.   **Meetings, Procedures and Authority.**

The Committee must meet at least once during each fiscal quarter.

The Committee may retain any independent counsel, experts or advisors that the Committee believes to be necessary or appropriate. The Company must provide for appropriate funding, as determined by the Committee, for payment of compensation to the independent auditor for the purpose of preparing or issuing an audit report or performing other audit, review or attest services, for payment of compensation to any independent counsel, experts or advisors employed by the Committee and for payment of ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties.

IV.    **Duties and Responsibilities.**
       _Interaction with the Independent Auditor_

1. _Appointment and Oversight._ The Committee is directly responsible for the appointment, compensation, retention and oversight of the work of the independent auditor (including resolution of any disagreements between Company management and the independent auditor regarding financial reporting) and any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attest services for the Company, and the independent auditor and each such other registered public accounting firm must report directly to the Committee.

_Annual Report on Independence._ The Committee must ensure that the independent auditor prepares and delivers, at least annually, a written statement delineating all relationships between the independent auditor and the Company, must actively engage in a dialogue with the independent auditor with respect to any disclosed relationships or services that, in the view of the Committee, may impact the objectivity and independence of the independent auditor, and, if the Committee determines that further inquiry is advisable, must take appropriate action in response to the independent auditor's report to satisfy itself of the auditor's independence.

2.

_Annual Financial Statements and Annual Audit_

_Form 10-K Review._ The Committee must review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's

Discussion and Analysis of Financial Condition and Results of Operations."

*Audit Committee Report.* The Committee must provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

3.

*Quarterly Financial Statements*

4. *Form 10-Q Review.* The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

*Other Duties and Responsibilities*

*Complaint Procedures.* The Committee must establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential and anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters.

*Related Party Transactions.* The Committee must review all related person transactions as defined by Item 404 of Regulation S-K on an ongoing basis and all such transactions must be approved or ratified by the Committee.

5.

*Review of this Charter.* The Committee must annually review and reassess this Charter and submit any recommended changes to the Board for its consideration.

6.

V.   **Delegation of Duties.**
In fulfilling its responsibilities, the Committee is entitled to delegate any or all of its responsibilities to a subcommittee of the Committee.

(Emphasis in original).

86.     In violation of the Audit Committee Charter, the Audit Committee Defendants (defined below) failed to adequately review and discuss the Company's quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal controls over financial reporting, disclosure controls and procedures, and Code of Conduct.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

87.     Expensify purports to operate as an expense management software platform that "helps the smallest to the largest businesses simplify the way they manage money." To this end, Expensify created a cloud-based platform which allows businesses to manage payments, design invoices, and pay bills, among other things.

88.     The Company was originally created to improve the experience of everyday employees' expense management. Today, Expensify's users can use the software to "scan and reimburse receipts from flights, hotels, coffee shops, office supplies and ride shares."

89.     Expensify filed the Registration Statement with the SEC on October 15, 2021. The Registration Statement was then declared effective by the SEC on November 9, 2021.

90.     Pursuant to the Registration Statement, Expensify's common stock began publicly trading on NASDAQ. Expensify uses the ticker symbol "EXFY".

91.     On November 12, 2021, the Company filed the Prospectus with the SEC on Form 424B4 in connection with the IPO. The Prospectus incorporated and formed part of the Registration Statement.

92.     The Company, along with other selling stockholders that had been identified in the Prospectus, sold approximately 2.6 million and 7.1 million shares of Expensify common stock to the public, respectively, at an offering price of $27.00 per share pursuant to the Offering

Documents. The total proceeds amounted to approximately $65 million and $178 million to Expensify and the selling stockholders, respectively.

93.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements in the Offering Documents. The Offering Documents failed to disclose, *inter alia*, that: (i) the Company's revenue growth was exponentially susceptible to macroeconomic and structural challenges; (ii) consequently, the Company exaggerated the efficiency of its Expensify's business model and the likelihood of success in meeting the long-term growth projections referenced in the Offering Documents; (iii) due to the foregoing, the Individual Defendants overstated Expensify's post-IPO growth, business, and financial prospects; and (iv) the Company did not maintain adequate internal controls. As a result, Expensify's public statements were materially false and misleading at all relevant times.

94.     In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Expensify to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between May 1, 2023 and May 31, 2023, approximately 504,493 shares of Expensify's common stock were repurchased, costing the Company over $2.9 million.

95.     In further breach of his fiduciary duties, Defendants Barrett, Schaffer, Muralidharan, and Vidal also failed to maintain internal controls while engaging in lucrative insider trading, reaping collective personal profits exceeding $11,905,952.

**Materially False and Misleading Statements**

### *The Offering Documents*

96.     Defendants Barrett, Schaffer, Bartlett, and Lent reviewed and signed the Offering

Documents. Defendant Barrett personally wrote and signed a letter that was included inside the

Offering Documents ("The IPO Letter"). In providing an overview of Expensify, Defendant

Barrett stated in the IPO Letter the following, in relevant part:

> Expensify is a cloud-based expense management software platform that helps the
> smallest to the largest businesses simplify the way they manage money. Every day,
> people from all walks of life in organizations around the world use Expensify to
> scan and reimburse receipts from flights, hotels, coffee shops, office supplies and
> ride shares. Since our founding in 2008, we have added over 10 million members
> to our community, and processed and automated over 1.1 billion expense
> transactions on our platform, freeing people to spend less time managing expenses
> and more time doing the things they love. For the quarter ended June 30, 2021, an
> average of 639,000 paid members across 53,000 companies and over 200 countries
> and territories used Expensify to make money easy.
>
> * * *
>
> We believe that our unique approach has created a highly scalable and efficient
> business model. We have experienced rapid growth in recent periods. Our revenue
> was $80.5 million and $88.1 million in the years ended December 31, 2019 and
> 2020, respectively. Our net income (loss) was $1.2 million and $(1.7) million in the
> years ended December 31, 2019 and 2020, respectively. Our adjusted EBITDA was
> $7.6 million and $26.8 million in the years ended December 31, 2019 and 2020,
> respectively. For the six months ended June 30, 2020 and 2021, our revenue was
> $40.6 million and $65.0 million, respectively. Our net income was $3.5 million and
> $14.7 million in the six months ended June 30, 2020 and 2021, respectively. Our
> adjusted EBITDA was $9.2 million and $22.9 million in the six months ended June
> 30, 2020 and 2021, respectively. See the section titled "Management's discussion
> and analysis of financial condition and results of operations" for additional
> information on our non-GAAP metrics.

97.     The Offering Documents discussed the Company's approach to expense

management and how Expensify's business model was the alleged key to the Company's

competitive advantage. In discussing this approach, the Offering Documents stated, in relevant

part:

Since our founding, we have taken a unique approach to expense management built on key, complementary elements:

- ***Platform strategy hyper-focused on the employee.*** We designed Expensify to be easily configured and used by every single employee within an organization, not just decision makers or managers.

***Viral, bottom-up business model driven by the employee.*** Our employee-focused platform strategy enables a viral, "bottom-up" adoption cycle that starts with an individual employee. After signing up for free on the website or downloading our free app to submit expenses and realizing the benefits of using Expensify, our enthusiastic members champion our platform internally, spreading it via word-of-mouth to other employees and convincing decision makers to adopt Expensify company-wide.

- 

***Word-of-mouth adoption supported by a market consensus approach.*** We believe that our happy members are the best form of marketing. We strive to build a superior platform that makes the lives of employees and admins easier so that they become our champions and promote us to other individuals and organizations. We deploy large scale brand advertising to build on this platform superiority and help create market consensus that Expensify is the category leader for expense management software.

- 

***Unique company culture and long-term vision.*** Our platform strategy and business model are complemented by our unique company culture and intense focus on the long-term happiness of our employees.

- 

We believe that these elements of our approach are hard to replicate, self-reinforcing and work together to drive a powerful competitive advantage.

(Emphasis in original).

98.    The Offering Documents further discussed the Company's business model, which

stated, in relevant part:

> Our platform strategy enables a viral "bottom-up" business model that is capital efficient and extremely scalable. Anyone can easily download our mobile application or go to our website to sign up for free on their own, and later upgrade to a paid subscription for advanced features. The adoption of Expensify within an organization often starts with the individual employee, who downloads our mobile application or signs up on our website for free and uses it to easily submit expenses to their manager with a few taps. After the employee realizes the benefits of our platform, they become a champion of Expensify and often spread it internally to other employees. With multiple employees using Expensify and valuable features simplifying the manager's job, the decision maker purchases a subscription to Expensify and becomes a paying customer with a few members. Our usage within an organization expands further as the company adds members and adopts new features such as the Expensify Card or Bill Pay. As of June 30, 2021, 60% of our revenue can be attributed to an instance where an employee used our application first and recommended it to their manager.
>
> We offer simple, transparent and flexible subscription plans for both individuals and businesses that are completely self-service and payable by credit card. In the quarter ended June 30, 2021, 95% of our revenue came from recurring, automated monthly payments made via credit cards. We designed our pricing plans to facilitate the easy adoption of our platform by the smallest mom-and-pop stores to the largest and most complex organizations.
>
> We believe that our happy members are the best form of marketing, and our self-service, bottom-up approach takes advantage of strong, organic word-of-mouth adoption. We support this powerful word-of-mouth marketing with large-scale brand advertising to build market consensus that Expensify is the software of choice for expense management.
>
> We believe that our frictionless, viral and bottom-up business model and word-of-mouth adoption allows us to not rely on traditional outbound marketing efforts that are costly and often ineffective. As a result, we can dedicate our energy and resources on strengthening our brand, improving our features and making it easier for more people to adopt Expensify.

99.    Regarding the Company's competitive strengths, the Offering Documents stated,

in relevant part:

> We believe our platform strategy, business model and culture provide us with competitive strengths that will allow us to maintain our position as a category leader

for expense management and extend our leadership to improving other back-office functions.

- **Hyper-focus on an improved experience for our members.** Since our inception, our principal goal has been to offer a single, intuitive and powerful platform with features designed for the actual end users of expense management software: everyday employees.

**Viral, bottom-up business model.** We leverage an efficient, self-service business model driven by the viral, bottom-up adoption of our platform by employees.

- 

**Recognized market consensus and efficient word-of-mouth.** Our members drive the adoption and expansion of Expensify within organizations, and our platform and business model are intensely focused on improving their everyday experience.

- 

**Employee-centric legal structure and database design.** Our platform is built on Bedrock, a proprietary and private distributed database that enables us to consolidate all members into a single database and maintain a direct legal relationship with each of them, where they own all their underlying data and control their account status. This non-partitioned, employee-owned account design underpins our success with bottom-up adoption.

- 

**Nimble and extremely loyal team with a shared, long-term vision.** Our efficient business model allows us to prioritize our resources to attract, retain and inspire a vastly more talent-dense team than our competition. We have achieved impressive levels of retention, which provides the necessary corporate patience and ambition to execute a truly massive, long-term vision.

-

(Emphasis in original).

100.    Regarding Expensify's growth strategies, the Offering Documents stated the following, in relevant part:

We intend to drive the growth of our business by executing on the following strategies:

- ***Build new features that create additional value for existing members.*** Our word-of-mouth model works well because people genuinely enjoy using Expensify. We intend to continue to invest in building features that increase the value our software delivers to our existing members. Our flat, generalist and democratic structure cultivates a diversity of ideas from every single one of our employees, which enables an efficient, scalable and rigorous product development process. In the month of June 2021, 70% of our team was involved in material aspects of research and development. By efficiently investing in new features that prioritize the needs of our members, we can continue to retain existing members and attract new members via word-of-mouth;

***Build new features that attract new members beyond employees who submit expenses.*** We have and will continue to invest in developing features complementary and adjacent to expense management. At most companies, not every employee generates expenses that would be submitted via an expense report. As we add additional features that can be used by all employees rather than just those that submit expense reports, we have the potential to monetize the segment of our customers' employees that are not submitting expense reports on a monthly basis, and increase revenue without adding more customers or raising prices. These features will enable easy financial collaboration within communities and between friends and family;

- ***Build viral loops into our member experience that increase adoption by new customers.*** We design our expense management platform and every new feature with the aim of frictionless adoption. For the six months ended June 30, 2021, approximately 60% of our revenue was driven by bottom-up adoption: individual employees download the Expensify mobile app or

sign up on our website, for free, and use it to submit their expenses to their bosses – turning every expense report into a highly targeted marketing message, straight to a decision maker. Outside of expense management, we have expanded our platform and built invoicing and bill payment features with the goal of replicating the frictionless adoption of our expense management feature. By sending an invoice using Expensify, accounts receivable departments naturally promote Expensify to their clients. A company that adopts Expensify bill payment tacitly promotes Expensify to all of their vendors: any one vendor that sends a manual invoice receives an email notifying them that their invoice was converted into an Expensify invoice, and they should sign in to collect payment online. We will continue to focus on the maintaining and extending the virality of our features to support our viral, bottom-up business model;

- 

*Expand and monetize transaction volume from existing and new customers.* We fully launched the Expensify Card in 2020 and, despite pullback in corporate expenses with the COVID-19 pandemic, customers have begun to adopt the card. We expect its adoption to continue to grow, especially as business travel is expected to return from the challenges caused by the COVID-19 pandemic. Going forward, we intend to increase the promotion of the Expensify Card to both new and existing customers to drive growth in adoption;

- 

*Promote Expensify's culture and values*. We believe that consumers are more likely to both use and recommend products from brands they admire. According to a proprietary research study conducted by Havas Group in 2019, 77% of consumers prefer to buy from companies who share their values. By consistently acting on and vocally promoting our values, we have the ability to both drive positive change and create brand awareness that can add to the virality of our

COMPLAINT                              38

platform. Our culture and values, including our adherence to Environmental, Social, and Governance (ESG) principles, will be shared in our company code of ethics and conduct and in future sustainability reporting;

- 

*Continue to strengthen our market consensus.* We have worked hard to establish and maintain Expensify as the dominant expense management platform for SMBs. We leverage a variety of targeted marketing strategies that involve industry conferences, industry influencers, partner marketing, our own conference and more to achieve market consensus that Expensify is the premier, industry standard expense management platform. This is essential to our viral and word-of-mouth business model. We plan to reinforce the market consensus surrounding our platform, as well as expand on these strategies across new feature verticals and markets;

- 

*Expand integrations and strengthen partnerships.* Expense management touches many functions across a company. To provide a seamless experience for our customers, we integrate with the accounting, ERP and travel software used by SMBs and their employees every day. We also have frictionless integrations with many of the technology providers that generate the most receipts for our members, such as Uber and Lyft. Through our *ExpensifyApproved!* Partner Program, we train and support accountants who then encourage their customers to use Expensify. We intend to continue to invest in both integrations and partnerships as they are critical to delivering best-in-class user experiences and ensuring that Expensify is deeply embedded within our customer base; and

-

*Expand internationally.* For the year ended December 31, 2020, and six months ended June 30, 2021, we derived 10% and 11% of our revenue, respectively, from customers outside the United States, and we see significant opportunity to acquire new customers internationally. Because word-of-mouth drives significant adoption, we have experienced member growth outside of our core geographies without investment in marketing or regional sales forces. We have the opportunity to accelerate international growth by investing in marketing, developing a localized platform experience and expanding international partnership and integrations.

- 

We believe that the combination of the strength of our platform, our scalable business model and our special company culture has us well-positioned to achieve these growth strategies.

(Emphasis in original).

101.    The aforementioned statements referenced in ¶¶ 96-100 were materially false and misleading because they failed to disclose, *inter alia*, that: (i) the Company's revenue growth was exponentially susceptible to macroeconomic and structural challenges; (ii) consequently, the Company exaggerated the efficiency of Expensify's business model and the likelihood of success in meeting the long-term growth projections referenced in the Offering Documents; (iii) due to the foregoing, the Individual Defendants overstated Expensify's post-IPO growth, business, and financial prospects; and (iv) the Company did not maintain adequate internal controls. As a result, Expensify's public statements were materially false and misleading at all relevant times.

### The 2022 Proxy Statement

102.    On April 29, 2022, Expensify filed a proxy statement on Schedule 14A filed with the SEC (the "2022 Proxy Statement") notifying shareholders of the 2022 Annual Meeting of Stockholders, to be held on June 22, 2022. Defendants Barrett, Schaffer, Muralidharan, Mills,

Vidal, Christen, Pao, and Liu solicited the 2022 Proxy Statement, filed pursuant to Section 14(a)

of the Exchange Act, which contained material misstatements and omissions.

103.    The 2022 Proxy Statement called for shareholder approval of, *inter alia*: (1) the re-

election of Defendants Barrett, Schaffer, Muralidharan, Mills, Vidal, Christen, Pao, and Liu to the

Board; and (2) the ratification of the appointment of Ernst & Young LLP as the independent

registered public accounting firm for Fiscal Year 2022.

104.    Regarding the Company's Code of Conduct, the 2022 Proxy Statement provided,

in relevant part:

> We have adopted a written code of ethics and conduct that applies to our directors,
> officers and employees, including our principal executive officer, principal
> financial officer, principal accounting officer or controller, or persons performing
> similar functions. A copy of the code is available on our investor relations website
> at investors.expensify.com. In addition, we intend to post on our investor relations
> website all disclosures that are required by law or the listing standards concerning
> any amendments to, or waivers from, any provision of the code. The information
> on or accessed through our website is deemed not to be incorporated in or part of
> this Proxy Statement or any other document filed with or furnished to the SEC.

105.    Regarding the Board's role in "Risk Oversight," the 2022 Proxy Statement

provided, in relevant part:

> Our Board of Directors is responsible for overseeing our risk management process.
> Our Board of Directors focuses on our general risk management strategy, the most
> significant risks facing us, our material environmental, social and governance
> ("ESG") risks and oversees the implementation of risk mitigation strategies by
> management. Our Board of Directors is also apprised of particular risk
> management matters in connection with its general oversight and approval of
> corporate matters and significant transactions.

106.    Regarding the Audit Committee's responsibilities, the 2022 Proxy Statement

provided, in relevant part:

> Our Audit Committee is responsible for, among other things:
>
> - appointing, compensating, retaining, evaluating, terminating and
>   overseeing our independent registered public accounting firm;

- discussing with our independent registered public accounting firm its independence from management;

- reviewing with our independent registered public accounting firm the scope and results of their audit;

- approving all audit and permissible non-audit services to be performed by our independent registered public accounting firm;

- overseeing the financial reporting process and discussing with management and our independent registered public accounting firm the interim and annual financial statements that we file with the SEC;

- reviewing and monitoring our accounting principles, accounting policies, financial and accounting controls and compliance with legal and regulatory requirements;

- reviewing our policies on risk assessment and risk management;

- reviewing related party transactions; and

- establishing procedures for the confidential anonymous submission of concerns regarding questionable accounting, internal controls or auditing matters.

Our Audit Committee consists of Mr. Christen, Ms. Liu and Ms. Pao, with Mr. Christen serving as chair. Rule 10A-3 of the Exchange Act and Nasdaq rules require that our Audit Committee be composed entirely of independent members. Our Executive Committee on behalf of our Board of Directors has affirmatively determined that Mr. Christen, Ms. Liu and Ms. Pao each meet the definition of "independent director" for purposes of serving on the audit committee under Rule 10A-3 and Nasdaq rules. Each member of our Audit Committee meets the financial literacy requirements of Nasdaq listing standards. In addition, our Executive Committee on behalf of our Board of Directors has determined that Mr. Christen qualifies as an "audit committee financial expert," as such term is defined in Item 407(d)(5) of Regulation S-K. Our Audit Committee operates under a written charter which satisfies the applicable listing standards of Nasdaq and which is available on our website at investors.expensify.com.

107.    Defendants Barrett, Schaffer, Muralidharan, Mills, Vidal, Christen, Pao, and Liu

caused the 2022 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that:

(i) the Company's revenue growth was exponentially susceptible to macroeconomic and structural

challenges; (ii) consequently, the Company exaggerated the efficiency of Expensify's business

model and the likelihood of success in meeting the long-term growth projections referenced in the Offering Documents; (iii) due to the foregoing, the Individual Defendants overstated Expensify's post-IPO growth, business, and financial prospects; and (iv) the Company did not maintain adequate internal controls. As a result, Expensify's public statements were materially false and misleading at all relevant times.

108.    The 2022 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as the Individual Defendants violated the Code of Conduct, including by allowing false and misleading statements to be issued to the investing public.

109.    As a result of Defendants Barrett, Schaffer, Muralidharan, Mills, Vidal, Christen, Pao, and Liu causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) reelect Defendants Barrett, Schaffer, Muralidharan, Mills, Vidal, Christen, Pao, and Liu to the Board, allowing them to continue to breach their fiduciary duties to the Company; and (2) ratify the appointment of Ernst & Young LLP as the Company's independent public accountants for the Fiscal Year 2022.

### The 2023 Proxy Statement

110.    On April 28, 2023, Expensify filed the 2023 Proxy Statement notifying shareholders of the 2023 Annual Meeting of Stockholders, to be held on June 21, 2023. Defendants Barrett, Schaffer, Muralidharan, Mills, Vidal, Christen, Pao, and Liu solicited the 2023 Proxy statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

111.    The 2023 Proxy Statement called for shareholder approval of, *inter alia*: (1) the re-election of Defendants Barrett, Schaffer, Muralidharan, Mills, Vidal, Christen, Pao, and Liu to the

Board; (2) ratification of the appointment of Ernst & Young LLP as the independent registered public accounting firm for the fiscal year ending on December 31, 2023 (the "Fiscal Year 2023"); and (3) the advisory vote on the frequency of future advisory votes on the compensation of the Company's named executive officers.

112.    Regarding the Company's Code of Conduct, the 2023 Proxy Statement provided, in relevant part:

> We have adopted a written code of ethics and conduct that applies to our directors, officers and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions. A copy of the code is available on our investor relations website at investors.expensify.com. In addition, we intend to post on our investor relations website all disclosures that are required by law or the listing standards concerning any amendments to, or waivers from, any provision of the code. The information on or accessed through our website is deemed not to be incorporated in or part of this Proxy Statement or any other document filed with or furnished to the SEC.

113.    Regarding the Board's role in "Risk Oversight," the 2023 Proxy Statement provided, in relevant part:

> Our Board of Directors is responsible for overseeing our risk management process. Our Board of Directors focuses on our general risk management strategy, the most significant risks facing us, our material environmental, social and governance ("ESG") risks and oversees the implementation of risk mitigation strategies by management. Our Board of Directors is also apprised of particular risk management matters in connection with its general oversight and approval of corporate matters and significant transactions.

114.    Regarding the Audit Committee's responsibilities, the 2023 Proxy Statement provided, in relevant part:

> Our Audit Committee is responsible for, among other things:
>
> - appointing, compensating, retaining, evaluating, terminating and overseeing our independent registered public accounting firm;
>
> - discussing with our independent registered public accounting firm its independence from management;

- reviewing with our independent registered public accounting firm the scope and results of their audit;

- approving all audit and permissible non-audit services to be performed by our independent registered public accounting firm;

- overseeing the financial reporting process and discussing with management and our independent registered public accounting firm the interim and annual financial statements that we file with the SEC;

- reviewing and monitoring our accounting principles, accounting policies, financial and accounting controls and compliance with legal and regulatory requirements;

- reviewing our policies on risk assessment and risk management;

- reviewing related party transactions; and

- establishing procedures for the confidential anonymous submission of concerns regarding questionable accounting, internal controls or auditing matters.

Our Audit Committee consists of Mr. Christen, Ms. Liu and Ms. Pao, with Mr. Christen serving as chair. Rule 10A-3 of the Exchange Act and Nasdaq rules require that our Audit Committee be composed entirely of independent members. Our Executive Committee on behalf of our Board of Directors has affirmatively determined that Mr. Christen, Ms. Liu and Ms. Pao each meet the definition of "independent director" for purposes of serving on the audit committee under Rule 10A-3 and Nasdaq rules. Each member of our Audit Committee meets the financial literacy requirements of Nasdaq listing standards. In addition, our Executive Committee on behalf of our Board of Directors has determined that Mr. Christen qualifies as an "audit committee financial expert," as such term is defined in Item 407(d)(5) of Regulation S-K. Our Audit Committee operates under a written charter which satisfies the applicable listing standards of Nasdaq and which is available on our website at investors.expensify.com.

115.    Defendants Barrett, Schaffer, Muralidharan, Mills, Vidal, Christen, Pao, and Liu caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (i) the Company's revenue growth was exponentially susceptible to macroeconomic and structural challenges; (ii) consequently, the Company exaggerated the efficiency of Expensify's business model and the likelihood of success in meeting the long-term growth projections referenced in the Offering Documents; (iii) due to the foregoing, the Individual Defendants overstated Expensify's

post-IPO growth, business, and financial prospects; and (iv) the Company did not maintain adequate internal controls. As a result, Expensify's public statements were materially false and misleading at all relevant times.

116.    The 2023 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as the Individual Defendants violated the Code of Conduct, including by allowing false and misleading statements to be issued to the investing public.

117.    As a result of Defendants Barrett, Schaffer, Muralidharan, Mills, Vidal, Christen, Pao, and Liu causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) reelect Defendants Barrett, Schaffer, Muralidharan, Mills, Vidal, Christen, Pao, and Liu to the Board, allowing them to continue to breach their fiduciary duties to the Company; (2) ratify the appointment of Ernst & Young LLP as the Company's independent public accountants for the Fiscal Year 2023; and (3) make the future advisory vote frequency one year regarding the advisory vote on the compensation of the Company's named executive officers.

## The Truth Emerges

118.    The truth began to emerge on June 12, 2023 when Morgan Stanley downgraded the Company from Equal-weight to Underweight. In particular, Morgan Stanley cited Expensify's risk-reward profile and structural challenges for the primary reasons behind the downgrade.

119.    On this news, the Company's common stock price fell $0.45 per share, or 6.28%, to close at $6.72 per share on June 12, 2023.

120.    The truth continued to emerge on August 8, 2023 when the Company issued a press release to announce its Q2 2023 Results. The Company reported GAAP EPS of -$0.14, missing the consensus estimate of -$0.07. Additionally, the press release stated, in relevant part:

**Financial:**

- *Revenue was $38.9 million, a decrease of 10% compared to the same period last year.*

- Utilized $0.4 million cash in operating activities and generated $1.1 million of free cash flow.

- *Net loss was $11.3 million, compared to $8.0 million for the same period last year.*

- *Non-GAAP net loss was $1.0 million.*

- Adjusted EBITDA was $2.2 million.

- Interchange derived from the Expensify Card grew to $2.7 million, an increase of 56% compared to the same period last year.

(Emphasis added).

121.    On the same day of August 8, 2023, the Company discussed the Q2 2023 Results in an earnings call with investors and analysts. During the question-and-answer portion of the earnings conference call, an analyst asked Defendant Muralidharan whether the Company intended to reaffirm its previously issued long-term 25%-35% revenue guidance. Defendant Muralidharan responded to the analyst, in relevant part:

[…] I'll say this for a few quarters now, since the day we went public really, we have not been in sort of normal or stable economic conditions.

And for a few quarters now, we keep reaffirming that long-term guidance, and we keep getting questions all around and they're fair, when will this long-term guidance actually, be true since we haven't been close to the long term guidance in terms of growth.

So we actually took all of your feedback and removed it because we just don't know what we don't know. We haven't been in stable condition since 2020 with this or that or the other. Like first there was a pandemic, then there was concerns of the global recession, then there was a global recession. There still is, like I'm fuzzy on the details, but very chaotic.

So we've removed it and then once we sort of hit stability again, we will be able to reaffirm it, but we don't want to keep giving you outdated long-term guidance, if you will. So that's the reason we took it away.

122.    As a result of these disclosures, JMP Securities downgraded Expensify from Market Outperform to Market Perform. On this news, the Company's stock price fell further. The stock price fell $1.69 per share, or 28.55% to close at $4.23 per share on August 9, 2023.

123.    The truth fully emerged on November 7, 2023, when the Company issued a press release announcing Q3 2023 Results. The Company reported a GAAP EPS of -$0.21. Additionally, the press release revealed:

**Financial:**

- ***Revenue was $36.5 million, a decrease of 14% compared to the same period last year***.

- The Company utilized $5.1 million cash in operating activities.

- Free cash flow was $(7.1) million.

- ***Net loss was $17.0 million, compared to $8.2 million for the same period last year***.

- ***Non-GAAP net loss was $6.7 million***.

- Adjusted EBITDA was $(3.5) million.

- Interchange derived from the Expensify Card grew to $3.1 million, an increase of 65% compared to the same period last year.

- Immediately following the end of the current quarter, the Company deployed $36.0 million of available cash to further reduce outstanding debt by paying off its term loan in full.

(Emphasis added).

124.    On this news, Expensify's common stock price continued to fall. The stock price fell $1.07 per share, or 36.89%, to close at $1.83 per share on November 8, 2023.

## REPURCHASES DURING THE RELEVANT PERIOD

125.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its own common stock that substantially damaged the Company.

126.    According to a Form 10-Q the Company filed with the SEC on August 9, 2023 for the quarterly period ended June 30, 2023, between May 1, 2023 and May 31, 2023, the Company purchased 504,493 shares of its own common stock at an average price of $5.93 per share for approximately $2,991,643.49. As the Company's stock was actually worth only $1.83 per share, the price at closing on November 8, 2023, the Company overpaid by approximately $2,068,421.30 for repurchases of its own stock between May 1, 2023, and May 31, 2023.

### DAMAGES TO EXPENSIFY

127.    As a direct and proximate result of the Individual Defendants' conduct, Expensify has lost and expended, and will continue to lose and expend, many millions of dollars.

128.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

129.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

130.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

131.    Such losses include the Company's overpayment of more than $2.9 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

132.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company, including the personal profits of the four Individual Defendants who engaged in lucrative insider sales, netting proceeds of approximately $11,905,952 during the Relevant Period.

133.    As a direct and proximate result of the Individual Defendants' conduct, Expensify has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

134.    Plaintiff brings this action derivatively and for the benefit of Expensify to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholder, officer, and director of Expensify, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, for contribution under Section 11(f) of the Securities Act and Section 21D of the Exchange Act, and for violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act.

135.    Expensify is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

136.    Plaintiff is, and has been at all relevant times, a shareholder of Expensify. Plaintiff will adequately and fairly represent the interests of Expensify in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

137.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above, as though fully set forth herein.

138.    A pre-suit demand on the Board is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eight individuals: Defendants Barrett, Schaffer, Muralidharan, Mills, Vidal, Christen, Pao, and Liu (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to four of the eight Director-Defendants who were on the Board at the time this action is commenced.

139.    Demand is excused as to all the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

140.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Expensify to make the materially false and misleading statements alleged herein. Specifically, the Director-Defendants knowingly or recklessly made material misrepresentations and/or omissions for the purpose and effect of concealing Expensify's financial well-being and prospects from the investing public and supporting the artificially inflated price of Expensify's securities. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. Moreover, Director-Defendants solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-election of the Director-Defendants, allowing them to continue to breach their

fiduciary duties to the Company. As a result of the foregoing, demand would be futile, and thus excused, as to all of the Director-Defendants, since they all breached their fiduciary duties, face a substantial likelihood of liability, and are not disinterested.

141.    Additional reasons that demand as to Defendant Barrett is futile follow. Defendant Barrett is the Company's founder. Defendant Barrett serves as the Company's CEO and as a Company director. He also serves as the Chair of the Compensation Committee. Defendant Barrett has served as both the Company's CEO and as a Company director since 2009. The Company provides Defendant Barrett with his principal occupation for which he receives handsome compensation. In Fiscal Year 2021 and Fiscal Year 2022, Defendant Barrett made a combined total of $21,622,445. Additionally, Defendant Barrett is a controlling shareholder of the Company. Thus, as the Company admits, he is a non-independent director. Moreover, Defendant Barrett solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-election of the Director-Defendants, allowing them to continue to breach their fiduciary duties to the Company. Furthermore, Defendant Barrett engaged in lucrative insider trading, reaping personal profits exceeding $5,780,964. As the Company's CEO, Defendant Barrett was ultimately responsible for all the false and misleading statements and omissions that were made, including those contained in the Offering Materials, which he personally signed. As the Company's highest officer, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, Defendant Barrett is a defendant in the Securities Class Action. For these reasons, too, Defendant Barrett

breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

142.    Additional reasons that demand as to Defendant Schaffer is futile follow. Defendant Schaffer has served as a Company director since 2017. Defendant Schaffer also serves as a member of the Compensation Committee and as the Company's CFO. The Company provides Defendant Schaffer with his principal occupation for which he receives handsome compensation. In Fiscal Year 2021 and Fiscal Year 2022, Defendant Schaffer made a combined total of $10,127,570. Thus, as the Company admits, he is a non-independent director. Additionally, Defendant Schaffer solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-election of the Director-Defendants, allowing them to continue to breach their fiduciary duties to the Company. Furthermore, Defendant Schaffer engaged in lucrative insider trading, reaping personal profits exceeding $645,298. As the Company's CFO, Defendant Schaffer was ultimately responsible for all the false and misleading statements and omissions that were made, including those contained in the Offering Materials, which he personally signed. As a trusted Company director and CFO, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Schaffer is a defendant in the Securities Class Action. For these reasons, too, Defendant Schaffer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

143.    Additional reasons that demand as to Defendant Muralidharan is futile follow. Defendant Muralidharan has served as a Company director since January 2021. Defendant

Muralidharan also serves as a member of the Compensation Committee and as the Company's COO. The Company provides Defendant Muralidharan with her principal occupation for which she receives handsome compensation. Thus, as the Company admits, she is a non-independent director. In Fiscal Year 2021 and Fiscal Year 2022, Defendant Muralidharan made a combined total of $6,338,119. Thus, as the Company admits, she is a non-independent director. Additionally, Defendant Muralidharan solicited the 2022 and 2023 Proxy Statements, both of which contained material misrepresentations and omissions that led to the re-election of the Director-Defendants, allowing them to continue to breach their fiduciary duties to the Company. Furthermore, Defendant Muralidharan engaged in lucrative insider trading, reaping personal profits exceeding $347,920. As a trusted Company director and COO, she conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Muralidharan breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

144.    Additional reasons that demand as to Defendant Mills is futile follow. Defendant Mills has served as a Company director since May 2021. Defendant Mills also serves as a member of the Compensation Committee and as the Company's CPO. Thus, as the Company admits, he is a non-independent director. Additionally, Defendant Mills solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-election of the Director-Defendants, allowing them to continue to breach their fiduciary duties to the Company. As a trusted Company director and CPO, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading

statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Mills breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

145.    Additional reasons that demand as to Defendant Vidal is futile follow. Defendant Vidal has served as a Company director since May 2021. Defendant Vidal also serves as a member of the Audit Compensation Committee and as CSO. Thus, as the Company admits, he is a non-independent director. Additionally, Defendant Vidal solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-election of the Director-Defendants, allowing them to continue to breach their fiduciary duties to the Company. Furthermore, Defendant Vidal engaged in lucrative insider trading, reaping personal profits exceeding $131,770.  As a trusted Company director and CSO, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Vidal breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

146.    Additional reasons that demand as to Defendant Christen is futile follow. Defendant Christen has served as a Company director since November 2021. Defendant Christen serves as the Chair of the Audit Committee. Additionally, Defendant Christen solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained material misrepresentations and

omissions that led to the re-election of the Director-Defendants, allowing them to continue to breach their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Christen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

147.    Additional reasons that demand as to Defendant Pao is futile follow. Defendant Pao has served as a Company director since November 2021. Defendant Pao is also a member of the Audit Committee. Defendant Pao solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-election of the Director-Defendants, allowing them to continue to breach their fiduciary duties to the Company.  As a trusted Company director, she conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Pao breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

148.    Additional reasons that demand as to Defendant Liu is futile follow. Defendant Liu has served as a Company director since November 2021. Defendant Liu also serves as a member of the Audit Committee. Defendant Liu solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-

election of the Director-Defendants, allowing them to continue to breach their fiduciary duties to the Company. As a trusted Company director, she conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Liu breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

149.    Additional reasons that demand on the Board is futile follow.

150.    All the Director-Defendants benefitted directly from the wrongdoing alleged herein, as the false and misleading statements caused the Company's stock price to be artificially inflated, thus increasing the value of Expensify stock held by the Director-Defendants.

151.    Demand in this case is further excused because Defendants Schaffer, Muralidharan, Mills, Vidal, Christen, Pao, and Liu are beholden to and controlled by Defendant Barrett, a primary interested wrongdoer who is Expensify's controlling shareholder and was Expensify's controlling shareholder during the Relevant Period. As such, Defendant Barrett controls their continued nomination to the Board. In light of this of this control, Defendants Schaffer, Muralidharan, Mills, Vidal, Christen, Pao, and Liu cannot impartially consider a demand against Defendant Barrett, an interested, primary wrongdoer, as they are dependent on him for their continued employment with the Company and the compensation that goes with that. Thus, Defendants Schaffer, Muralidharan, Mills, Vidal, Christen, Pao, and Liu are unable to evaluate a demand with disinterest or independence given Defendant Barrett's control over them.

152.    Each of the Director-Defendants, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and

harmful repurchases that caused the Company to overpay by approximately $2.9 million for its own common stock during the Relevant Period. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

153.    Defendants Christen, Pao, and Liu (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

154.    Defendants Barrett (as Chair), Muralidharan, Schaffer, Vidal, and Mills (the "Compensation Committee Defendants") served as members of the Compensation Committee during the Relevant Period. As such, they were responsible for determining the compensation of the Company's officers and directors, including the Director-Defendants as a result of the Director-Defendants soliciting the 2022 and the 2023 Proxy Statement which contained false and

misleading statements and omitted material facts. In particular, the Compensation Committee Defendants ensured that certain of the Individual Defendants were motivated to issue false and misleading statements and to artificially inflate the growth and overall performance of the Company by awarding the Individual Defendants' compensation. In Fiscal Year 2022, the Compensation Committee Defendants provided personal material benefits to three of the Director-Defendants in the form of salary, stock awards, bonuses, and/or all other forms of compensation while the Director-Defendants were breaching their fiduciary duties to the Company. Specifically, Defendants Barrett, Schaffer, and Muralidharan, received $1,654,892, $874,840, and $470,657, respectively, in compensation for Fiscal Year 2022. Therefore, Defendants Barrett, Schaffer, and Muralidharan are unable to independently and disinterestedly assess a demand against the Compensation Committee Defendants as they have received, and continue to receive, material personal benefits from them. Moreover, all the Director-Defendants—including the Compensation Committee Defendants—breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

155.    In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the

law. Thus, the Director-Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

156.    Expensify has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for Expensify any part of the damages Expensify suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

157.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's Audit Committee Charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

158.    The acts complained of herein constitute violations of fiduciary duties owed by Expensify's controlling shareholders, officers, and directors, and these acts are incapable of ratification.

159.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Expensify. If there is a directors' and officers'

liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Expensify, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

160.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Expensify to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

161.    Thus, for all the reasons set forth above, all the Director-Defendants, and, if not all of them, at least four of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against Individual Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934**

162.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

163.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of

such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

164.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

165.    Under the direction and watch of the Individual Defendants, the 2022 Proxy Statement and the 2023 Proxy Statement failed to disclose that: (i) the Company's revenue growth was exponentially susceptible to macroeconomic and structural challenges; (ii) consequently, the Company exaggerated the efficiency of Expensify's business model and the likelihood of success in meeting the long-term growth projections referenced in the Offering Documents; (iii) due to the foregoing, the Individual Defendants overstated Expensify's post-IPO growth, business, and financial prospects; and (iv) the Company did not maintain adequate internal controls. As a result, Expensify's public statements were materially false and misleading at all relevant times.

166.    Under the direction and watch of the Individual Defendants, the 2022 Proxy Statement and the 2023 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2022 Proxy Statement's and the 2023 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not

adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

167.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement and the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement and the 2023 Proxy Statement, including the election of directors, advisory approval of executive compensation, and ratification of the appointment of an independent registered public accounting firm.

168.    As a result of the material misstatements and omissions contained in the 2022 Proxy Statement, Company shareholders voted to re-elect Defendants Barrett, Schaffer, Muralidharan, Mills, Vidal, Christen, Pao, and Liu to the Board, thus allowing them to continue breaching their fiduciary duties to Expensify.

169.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2022 Proxy Statement.

170.    As a result of the material misstatements and omissions contained in the 2023 Proxy Statement, Company shareholders voted to re-elect Defendants Barrett, Schaffer, Muralidharan, Mills, Vidal, Christen, Pao, and Liu to the Board, thus allowing them to continue breaching their fiduciary duties to Expensify.

171.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2023 Proxy Statement.

172.    Plaintiff, on behalf of Expensify, has no adequate remedy at law.

## **SECOND CLAIM**

**Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934**

173.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

174.     The Individual Defendants, by virtue of their positions with Expensify and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Expensify and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Expensify to engage in the illegal conduct and practices complained of herein.

Plaintiff, on behalf of Expensify, has no adequate remedy at law.

## THIRD CLAIM

**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934**

175.     The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Expensify. Not only is Expensify now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Expensify by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase more than one hundred thousand of its own shares at artificially inflated prices, damaging Expensify.

176.     The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices

and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Expensify not misleading.

177.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as controlling shareholders, officers, and directors of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Expensify.

178.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

179.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

180.    Plaintiff, on behalf of Expensify, has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

181.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

182.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Expensify's business and affairs.

183.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

184.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Expensify.

185.    In breach of their fiduciary duties owed to Expensify, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that (i) the Company's revenue growth was exponentially susceptible to macroeconomic and structural challenges; (ii) consequently, the Company exaggerated the efficiency of Expensify's business model and the likelihood of success in meeting the long-term growth projections referenced in the Offering Documents; (iii) due to the foregoing, the Individual Defendants overstated Expensify's post-IPO growth, business, and financial prospects; and (iv) the Company did not maintain adequate internal controls. As a result, Expensify's public statements were materially false and misleading at all relevant times.

186.    The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, thus rendering them personally liable to the Company for breaching their fiduciary duties.

187.    Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

188.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the

misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Expensify's securities, and disguising insider transactions.

189.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Expensify's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

190.    In a result of the material misstatements and omissions contained in the 2022 and 2023 Proxy Statements, Company shareholders voted to re-elect the Director-Defendants to the Board, thus allowing them to continue breaching their fiduciary duties to Expensify.

191.    In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase hundreds of thousands of shares of its own common stock at artificially inflated prices before the fraud was exposed, while four of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $11,905,952.

192.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

193.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Expensify has sustained and continues to sustain significant damages.

194.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

195.    Plaintiff, on behalf of Expensify, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

196.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

197.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Expensify.

198.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Expensify that was tied to the performance or artificially inflated valuation of Expensify, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

199.    Plaintiff, as a shareholder and representative of Expensify, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

200.    Plaintiff, on behalf of Expensify, has no adequate remedy at law.

## SIXTH CLAIM

### Against the Individual Defendants for Abuse of Control

201.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

202.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Expensify, for which they are legally responsible.

203.    As a direct and proximate result of the Individual Defendants' abuse of control, Expensify has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Expensify has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

204.    Plaintiff, on behalf of Expensify, has no adequate remedy at law.

## SEVENTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

205.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

206.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Expensify in a manner consistent with the operations of a publicly-held corporation.

207.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Expensify has sustained and will continue to sustain significant damages.

208.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

209.    Plaintiff, on behalf of Expensify, has no adequate remedy at law.

## EIGHTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

210.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

211.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

212.    In addition, the Individual Defendants caused the Company to repurchase hundreds of thousands of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

213.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

214.    Plaintiff, on behalf of Expensify, has no adequate remedy at law.

## NINTH CLAIM

### Against Defendants Barrett, Schaffer, Bartlett, and Lent for Contribution Under Section 11(f) of the Securities Act and Section 21D of the Exchange Act

215.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

216. As a result of the conduct and events alleged above, the Company is a defendant in the Securities Class Action brought on behalf of Expensify shareholders, in which it is a joint tortfeasor in claims brought under Section 11 and 15 of the Securities Act.

217. Federal law provides Expensify with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

218. The plaintiffs in the Securities Class Action allege that the Offering Documents contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and omitted to state material facts required to be stated therein.

219. Expensify is the registrant for the Offering. Defendants Barrett, Schaffer, Bartlett, and Lent were responsible for the contents and dissemination of the Offering Documents.

220. As issuer of the shares, Expensify is strictly liable to the class action plaintiffs and the class for the misstatements and omissions.

221. The plaintiff in the Securities Class Actions allege that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents and other subsequent public filings were true and without omissions of any material facts and were not misleading.

222. Defendants Barrett, Schaffer, Bartlett, and Lent, because of their positions of control and authority as controlling shareholders, officers, and directors of Expensify, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Expensify, including the wrongful acts complained of herein and in the Securities Class Action.

223. Accordingly, Defendants Barrett, Schaffer, Bartlett, and Lent are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the

application of a private right of action for contribution arising out of violations of the Securities Act.

224.    As such, Expensify is entitled to receive all appropriate contribution or indemnification from Defendants Barrett, Schaffer, Bartlett, and Lent.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Expensify, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Expensify;

(c)    Determining and awarding to Expensify the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Expensify and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Expensify and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Expensify to nominate at least five

candidates for election to the Board; and

      3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

      (e)     Awarding Expensify restitution from the Individual Defendants, and each of them;

      (f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

      (g)     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.


Dated: May 9, 2024

      Respectfully submitted,
      **CHENOWETH LAW GROUP**

      */s/ Aurelia Erickson*
      Robert J. McGaughey, OSB No. 800787
      Aurelia Erickson, OSB No. 126170
      510 SW Fifth Avenue, 4th Floor
      Portland, OR  97204
      Phone: (503) 221-7958
      Fax:  (503) 221-2182
      Email: bobm@chenowethlaw.com
      Email: aerickson@chenowethlaw.com

      *Liaison Counsel for Plaintiff*

      **THE BROWN LAW FIRM, P.C.**
      Timothy Brown
      (*pro hac vice* application forthcoming)
      767 Third Avenue, Suite 2501
      New York, NY 10017
      Telephone: (516) 922-5427
      Email: tbrown@thebrownlawfirm.net

      *Counsel for Plaintiff*